IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| BRENDA F. KINCAID, | ) | |
| | ) | |
| Plaintiff, | ) | 7:06CV5004 |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| SOCIAL SECURITY ADMINISTRATION, | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner, | ) | |
| | ) | |
| Defendant. | ) | |

    Brenda F. Kincaid (Kincaid) filed an application for disability benefits under the Social Security Act (Act), 42 U.S.C. §§ 401 *et seq.*, on April 20, 2004. The Social Security Administration (SSA) denied benefits initially and on reconsideration. On July 21, 2005, an administrative law judge (ALJ) held a hearing and, on October 4, 2005, determined Kincaid was not disabled under the Act. The Appeals Council denied Kincaid's request for review on January 10, 2006. Kincaid now seeks judicial review of the ALJ's determination as it represents the final decision of the Commissioner of the Social Security Administration.[1]

    Kincaid filed a brief (Filing No. 13) with an appendix of evidence and a reply brief (Filing No. 19) in support of this administrative appeal. The Commissioner filed the transcript of the administrative record (TR.) (Filing No. 7) and a brief (Filing No. 16) in opposition of Kincaid's appeal for benefits. Kincaid appeals the ALJ's decision and asks that the case be remanded for an award of benefits for three reasons: (1) the ALJ misinterpreted the progress notes and improperly disregarded the opinion in Dr. Blakely's report; (2) the ALJ's finding of Kincaid's residual functional capacity (RFC) is not supported by substantial evidence on the record; and (3) the ALJ failed to develop the record and should have ordered a consultive examination. **See** Filing No. 13. This court has jurisdiction to review the final decision of the Commissioner of Social Security under 42

---

[1] The parties consented to jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). **See** Filing No. 10.

U.S.C § 405(g) (2005). The court has reviewed the record, the ALJ's evaluation and findings, the parties' briefs, the transcript, and applicable law, and finds the ALJ's ruling that Kincaid is not disabled should be affirmed as supported by substantial evidence on the record.

## PROCEDURAL BACKGROUND

Kincaid applied for disability benefits on April 20, 2004, pursuant to the Act. Kincaid alleged an inability to engage in any substantial and gainful work activity after April 19, 2004, due to autoimmune condition referred to as polymyositis (TR. 13, 24). The SSA denied benefits initially and on reconsideration (TR. 30-33, 38-41). Thereafter, on July 21, 2005, ALJ Ronald D. Lahners held a hearing and issued a decision on October 4, 2005 (TR.11, 13-25). The ALJ determined Kincaid was not disabled pursuant to 20 C.F.R. § 404.1520 and 20 C.F.R. § 416.920(f) and was not eligible for disability benefits under the Act (TR. 24-25). The Appeals Council denied Kincaid's request for review on January 10, 2006 (TR. 6).

## FACTUAL BACKGROUND

**A.    Medical Records**

Kincaid filed her application for disability benefits alleging she became disabled on April 19, 2004, due to polymyositis (TR. 62-65). Kincaid was born in 1956 (TR. 63). Kincaid was diagnosed with polymyositis in 2000 (TR. 225-26). On July 15, 2003, Kincaid was examined by rheumatologist Kent W. Blakely, M.D. for a follow up of polymyositis (TR. 181). Kincaid was "feeling well", "her muscles were doing well", and she had been riding six miles on a bicycle (TR. 181). She also reported no dyspepsia (TR. 181). Kincaid was taking Imuran, Prednisone, and medication to treat osteoporosis and an acid reducer (TR. 181). On examination, Dr. Blakely found Kincaid was in no acute distress, was neurologically intact, and had "good" leg strength although she had occasional headaches (TR. 181). A muscoskeletal examination revealed no pain or swelling in any joints (TR. 184). Dr. Blakely's assessment was polymyositis and high risk medications, and he decreased her Prednisone and Imuran dosages (TR. 182-83).

On July 18, 2003, Kincaid was examined by Scott Smith, M.D. (TR. 185). Dr. Smith noted Kincaid had been doing well (TR. 185). Kincaid complained of recurrent headaches, which Dr. Smith assessed as stress headaches and recommended Midrin as needed (TR. 185). Kincaid's other diagnoses included polymyositis, well controlled gastroesophageal reflux disease (GERD), osteoporosis treated with Fosamax, and well controlled stress incontinence (TR. 185).

Kincaid continued to see Dr. Blakely. On November 24, 2003, Dr. Blakely reported Kincaid's muscles were "doing great," and she was "keeping busy, feeling fine" (TR. 177). A muscoskeletal examination revealed no pain or swelling in the joints (TR. 180). On February 26, 2004, Dr. Blakely treated Kincaid for a rash on her legs (TR. 171). Dr. Blakely noted "good strength" and continued Kincaid's regular medication (TR. 173). A muscoskeletal examination again revealed no problems (TR. 174). On April 22, 2004, Kincaid called Dr. Blakely to request an antidepressant, as she was "having problems with stress due to job" (TR. 170).

On June 2, 2004, Dr. Blakely examined Kincaid and Kincaid reported she was "pretty good," "few bad days," "strength about same," "stomach ok" (TR. 165). Kincaid was walking two miles, lifting about the same, and had been off of Imuran, an immunosuppressive medication, for about six months with no change in symptoms (TR. 165). Dr. Blakely noted Kincaid's arm strength was 4/5 and her leg strength was 5/5 (TR. 165). In addition, Dr. Blakely wrote Kincaid was "filing for disability, records will support her claim" (TR. 165).

Also, on June 2, 2004, Dr. Smith examined Kincaid and Kincaid reported her stomach had been doing "extremely well" and denied any new complaints (TR. 163). Dr. Smith noted Kincaid's depression was stable on Effexor therapy (TR. 163). He also ordered a bone scan to monitor Kincaid's osteoporosis (TR. 163). The scan showed a decrease in Kincaid's bone mass, but because she was on Fozamax and Dr. Blakely was starting to taper her steroids, Dr. Smith did not want to make any changes at that time (TR. 162, 169). Dr. Smith noted the polymyositis "does appear to be well controlled at this time" (TR. 163).

On June 10, 2004, Dr. Blakely examined Kincaid who had awoken with severe back pain which increased throughout the day (TR. 158). An examination revealed lumbosacral tenderness (TR. 161). Dr. Blakely prescribed pain medication and advised Kincaid to apply ice to her back (TR. 160). On June 15, 2004, Kincaid called Dr. Blakely to refill her prescription for a muscle relaxer and stated she was feeling better (TR. 157).

On September 2, 2004, Kincaid saw Dr. Blakely for a follow-up examination and reported she was "having some bad days," her back "has hurt" for which she tried Flexeril/Vicodin, she had generalized malaise, and that she was having some rash on her legs (TR. 209). Dr. Blakely prescribed medication for her rash and advised Kincaid to continue with her current medications and return for follow-up in four months (TR. 209-11).

On January 17, 2005, Kincaid returned for her follow-up and reported she had been "doing well" since her last visit (TR. 205). She had traveled to Florida and felt well, but reported occasional problems with fatigue and stress (TR. 205). Kincaid advised Dr. Blakely she was planning a cruise in February, after which Dr. Blakely was going to further taper the Prednisone dosage (TR. 205). The musculoskeletal examination did not reveal any swelling concerns (TR. 205-06).

On May 18, 2005, Kincaid saw Dr. Blakely and reported she was feeling well most of the time; spring house cleaning had caused increased symptoms; she had some dysphagia with eating breads; she was a little stiff in the morning; she had decreased stamina with stairs and "does one at a time"; she "walks 1 mile" and walking more than 1 mile increases her symptoms; and that she was on "low dose Prednisone" and "doing well" (TR. 202). The physical examination showed Kincaid had 5/5 muscle strength in her arms and 5/5 muscle strength in her legs (TR. 202). Dr. Blakely advised Kincaid to continue with her current medications and to return in four months (TR. 202).

On July 13, 2005, Dr. Blakely completed a medical questionnaire regarding Kincaid's Social Security Disability claim (TR. 197). In that questionnaire, Dr. Blakely reported Kincaid had polymyositis which he noted as a chronic autoimmune condition (TR. 197). He stated Kincaid had been, and currently was, being treated with corticosteroids and immunosuppressants, and that she was initially treated with high dose steroids and Azathioprine (TR. 197). Dr. Blakely opined Kincaid's prognosis was "fair to poor," but

4

hoped her muscle strength had stabilized (TR. 197).  He also opined Kincaid could sit up to one hour at a time for a total of four to six hours in an eight-hour day, stand continuously for one hour in an eight-hour day, and walk for 10-15 minutes at a time (TR. 197).  Dr. Blakely opined Kincaid could frequently lift up to 5 pounds and "maybe" occasionally lift up to 20 pounds, could frequently carry up to 5 pounds and occasionally carry up to 10 pounds in an eight-hour work day (TR. 198).  However, he opined Kincaid could never crawl, kneel or climb; could occasionally bend, stoop and reach; could use both hands for repetitive actions, such as simple grasping, pushing and pulling of arm controls, and fine manipulation, but could not use her legs and feet for repetitive movements such as pushing and pulling of leg controls (TR. 198).

In the July 13, 2005 questionnaire, Dr. Blakely also opined Kincaid's muscle strength and endurance were "severely" impaired (TR. 198).  He opined Kincaid was unable to be around unprotected heights and moving machinery because she did not have sufficient muscle to move effectively (TR. 199).  She also had "moderate" restrictions on her ability to handle stress, as stress would cause a flare up of her autoimmune condition (TR. 199). Additionally. Kincaid had "mild" restrictions in her ability to handle marked changes in temperature and humidity, to drive a motor vehicle, and in exposure to dust, fumes, and gas (TR. 199).  Dr. Blakely opined Kincaid's polymyositis caused pain, due to muscle inflamation, and nasal regurgitation of food when it was not controlled (TR. 200).  He also reported Kincaid needed to lie down and rest during the day to prevent muscle fatigue and flare ups (TR. 200).  Kincaid was also to avoid exertion to the point of exhaustion (TR. 200).

Finally, Dr. Blakely opined Kincaid had been unable to engage in substantial gainful activity since her alleged onset date, and that due to the severe and chronic nature of her disease he had advised her not to work (TR. 200).  As support for his assessment, Dr. Blakely wrote:  "She has limited abilities even with activities of daily living such as stairs, chairs (in, out) & eating (difficulty [with] foods nasally regurgitation) due to her polymyositis" (TR. 200).  Dr. Blakely also stated Kincaid suffered from a chronic condition with a poor prognosis (TR. 201).  He did not expect significant improvement and was hopeful but not certain Kincaid could maintain her current level of functioning (TR. 201).  Dr. Blakely stated the condition has lasted or can be expect to last at least 12 months (TR. 201).

**B.     Administrative Hearing**

At the administrative hearing on July 21, 2005, Kincaid testified she was 48 years old and had not worked since April 2004 (TR. 221). She graduated from high school and has held employment as a secretary, a bookkeeper and a store attendant (TR. 223). In the past fifteen years, Kincaid was employed by her parents' telephone company until she was let go due to health concerns (TR. 222-23). Kincaid alleged a disability onset date of April 19, 2004, and has not been employed since that time (TR. 221-22).

Kincaid testified polymyositis kept her from working, as she has "a lot of down days" where she doesn't "feel good," she never knows when "they're going to hit," and two or three days of the week she doesn't feel good on a regular basis (TR. 223). Specifically, she would go home from work and be exhausted, experience numbness and stress related inflammation and achiness (TR. 223). She testified her disease causes difficulty swallowing, although this aspect has gotten better with treatment, and pain in her shoulders, arms, hips, legs, and lower back (TR. 227). Kincaid testified she has some trouble walking, climbing stairs and getting in and out of chairs (TR. 229-30). Kincaid estimated she could sit for about one hour at a time and had to lie down for one to one and a half hours each day (TR. 230). She was able to dress herself, but was no longer able to raise her arms long enough to do her hair (TR. 230-31). Kincaid testified she cannot get another job because she "can't work very long at a time and then [she] never know[s] what days [she's] going to be sick" (TR. 231). However, in June 2004, Kincaid was walking two miles a day (TR. 232). At the time of the hearing, Kincaid was walking eight blocks each day (TR. 233). Kincaid explained she has flare ups of weakness and pain (TR. 232). Kincaid testified she used several different types of medication for her symptoms including taking a muscle relaxer everyday, and pain medication everyday, which is normally Ultram, but Kincaid takes hydrocodone, as needed, when the pain is worse (TR. 224-25).

Susan Wyatt, who has been a friend of Kincaid's since they were children, also testified at the hearing (TR. 234). Ms. Wyatt testified she first observed Kincaid having difficulties in the spring of 2000, and, where Kincaid had formerly been "very, very active," Kincaid had become unable to continue activities such as gardening, mowing the lawn, or quilting (TR. 235-36, 38-39). Ms. Wyatt testified she saw Kincaid have "one of her bad

6

flare-ups" when she was in a lot of pain, although Kincaid did not previously complain about pain (TR. 235). Ms. Wyatt testified she sometimes stopped in and observed Kincaid "all limp" and Kincaid only recently admitted to Ms. Wyatt times when she was hurting (TR. 239). Ms. Wyatt testified they were still able to go shopping, however Kincaid could no longer physically go from store to store and had to start carrying a lighter purse (TR. 236). Ms. Wyatt testified she had observed times when Kincaid was unable to take the lid off of a bottle of pop because she did not have the grip to turn the bottle (TR. 237).

Ms. Wyatt estimated Kincaid has bad days at least two times a week (TR. 237). Ms. Wyatt testified she had seen Kincaid have a "bad day" when they traveled together, in October 2004, and the trip was cut short when Kincaid became "really sick" (TR. 239). Ms. Wyatt stated Kincaid's episode of intense pain lasted for three hours (TR. 239). Finally, Ms. Wyatt testified Kincaid was "very fine" some days, and "not" on others (TR. 240). Ms. Wyatt opined Kincaid was unable to work eight hours a day (TR. 240).

A vocational expert (VE) under contract with the Office of Hearings and Appeals testified at the administrative hearing (TR. 240-44). The ALJ posed hypothetical questions to the VE which included an individual of Kincaid's age, education, and experience; who could lift five pounds frequently and ten pounds occasionally; who could stand for two hours in an eight-hour day, and who could sit for six hours in an eight-hour day with normal breaks (TR. 241). The individual would have unlimited use of their hands and arms, but should avoid exposure to concentrated heat or cold, hazards such as heights or open machinery, and should not be required to climb any ladders or scaffolds (TR. 241). The individual could occasionally bend, stoop, kneel, crouch, or crawl (TR. 241).

The VE testified such an individual would be capable of performing Kincaid's past relevant work as a secretary and bookkeeper or other clerical or receptionist work (TR. 241, 243). Further, these types of jobs are plentiful in the regional and national economy (TR. 242-43). The ALJ added the limitation of missing one day of work per month at unscheduled times, and the VE testified both jobs were skilled and employers were less likely to tolerate an employee consistently missing one day of work per month in skilled positions (TR. 241-42). The VE testified such an individual would also be capable of performing unskilled work such as general office clerk and data clerk, and that missing one

7

day per month would be more acceptable in such a position (TR. 243-44). The VE opined that a person missing more than one day each month at unscheduled times would not be able to hold a job, even in an unskilled position (TR. 242, 244).

## THE ALJ'S DECISION

The ALJ concluded Kincaid was not disabled under the Act and was not entitled to any disability benefits (TR. 14). The ALJ framed the issues as: 1) whether the claimant was entitled to a period of disability and disability insurance benefits under sections 216(i) and 223 of the Act; and 2) whether the claimant was under a disability and, if so, when such disability commenced and the duration thereof (TR. 13). As noted by the ALJ, the Act defines "disability" as an inability to engage in any substantial gainful activity due to physical or mental impairments (TR. 13). 42 U.S.C. § 423 (D)(1)(A) (2004); 20 C.F.R. § 404.1505 (2006). These impairments must be expected to result in death or must last for a continuous period of at least 12 months. *Id.*

The ALJ must evaluate a disability claim according to the sequential five-step analysis prescribed by the Social Security regulations. **See** *Goff v. Barnhart*, 421 F.3d 785, 789-90 (8th Cir. 2005); 20 C.F.R. § 404.1520(a)-(f).

> During the five-step process, the ALJ considers (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff*, 421 F.3d at 790 (quotation omitted). More specifically, the ALJ examines:

> [A]ny current work activity, the severity of the claimant's impairments, the claimant's residual functional capacity and age, education and work experience. **See** 20 C.F.R. § 404.1520(a); **Braswell v. Heckler**, 733 F.2d 531, 533 (8th Cir. 1984). If the claimant suffers from an impairment that is included in the listing of presumptively disabling impairments (the Listings), or suffers from an impairment equal to such listed impairment, the claimant will be determined disabled without considering age, education, or work experience. **See Braswell**, 733 F.2d at 533. If the Commissioner finds that the

> claimant does not meet the Listings but is nevertheless unable to perform his or her past work, the burden of proof shifts to the Commissioner to prove, first, that the claimant retains the residual functional capacity to perform other kinds of work, and, second, that other such work exists in substantial numbers in the national economy.  **See *Nevland v. Apfel***, 204 F.3d 853, 857 (8th Cir. 2000).  A claimant's residual functional capacity is a medical question.  **See *id.*** at 858.

***Singh v. Apfel***, 222 F.3d 448, 451 (8th Cir. 2000).  "If a claimant fails to meet the criteria at any step in the evaluation of a disability, the process ends and the claimant is determined to be not disabled."  ***Pelkey v. Barnhart***, 433 F.3d 575, 577 (8th Cir. 2006) (quotation omitted)).

In this case, the ALJ followed the appropriate sequential analysis.  The ALJ reviewed the record and found Kincaid had not engaged in any type of substantial and gainful work activity since April 19, 2004 (TR. 14).  Next, the ALJ found Kincaid's medically determinable impairment (polymyositis) could reasonably be expected to produce the type of symptoms, e.g., musculoskeletal discomfort, Kincaid described (TR. 20).  Further, the ALJ determined Kincaid's polymyositis was a "severe" medical impairment under the Act because it imposes more than slight limitations on her ability to function (TR. 17).  At step three, the ALJ stated Kincaid did not contend polymyositis was comparable to the medical impairments recited in the Listings and the evidence would not support such a finding (TR. 17).  However, the ALJ proceeded to step four to determine Kincaid's residual functional capacity (RFC) (TR. 17-24).

In assessing RFC, the ALJ, citing 20 C.F.R. § 404.1529 and ***Polaski v. Heckler***, 739 F.2d 1320 (8th Cir. 1984), discounted Kincaid's credibility as to the severity of her symptoms and her inability to function  (TR. 18-19).  The ALJ found that Kincaid's allegations were inconsistent with her own reports to her physicians, including the number of bad days she has each week, and with the physicians' notes (TR. 21).  Specifically, "on June 2, 2004 (about 1-1/2 months subsequent to her alleged onset date of disability), the Claimant advised Dr. Blakely that she was doing good, her swallowing was 'OK' and she was walking two miles" (TR. 21).  At that time both physicians noted Kincaid had an unremarkable musculoskeletal examination and Dr. Smith opined Kincaid's polymyositis

9

"has been stable" and was well controlled (TR. 21). The ALJ stated Kincaid seemed able to do what she wanted including vacations in October 2004, December 2004 and February 2005, as well as walking two miles per day or one mile a day, as recently as May 18, 2005, without an increase in symptoms (TR. 21). Finally, the ALJ stated Kincaid's report of muscle weakness was inconsistent with Dr. Blakely's notes reflecting 5/5 muscle strength in her arms and legs on May 18, 2005 (TR. 21). The ALJ asked Kincaid about the inconsistency during the hearing, Kincaid responded that she has flare-ups of weakness and pain, and that extreme heat and cold affect her symptoms (TR. 232).

In addition to finding Kincaid lacked credibility, the ALJ discounted Dr. Blakely's assessment that Kincaid was unable to work, because whether Kincaid is unable to work or is "disabled" under the Act is for the Commissioner to decide (TR. 22). Also, the ALJ did not give significant weight to Dr. Blakely's July 13, 2005 opinions that Kincaid's muscular strength was severely impaired and that she did not have sufficient muscle to move effectively (TR. 21). The ALJ specifically noted:

> [S]uch statements are clearly inconsistent with Dr. Blakely's own progress notes which indicate as recently as May 18, 2005 (when the Claimant was apparently last seen by Dr. Blakely for routine follow-up prior to completing the report) that the Claimant has 5/5 muscle strength in her legs and arms as well as his notation that the Claimant's activities include walking a distance of 1 mile without an increase in symptoms (Exhibit 16F/1). As noted earlier, physical examinations of the Claimant have also not indicated any atrophy or muscle wasting.

Based on the ALJ's evaluation of the evidence, including third-party reports, the ALJ determined the evidence does not support a finding of disability (TR. 22). The ALJ found Kincaid has the following RFC:

> she has transferable skills from her past relevant work, . . . she could life 10 pounds occasionally and 5 pounds frequently; in an 8 hour day, the Claimant could stand for 2 hours and sit for 6 hours and, with normal breaks, complete the work day; she has unlimited use of her hands and arms; . . . she could occasionally bend, stoop, kneel, crouch, crawl; and she would likely miss one day of work per month at unscheduled times.

The ALJ further determined, because of Kincaid's medically determinable impairment, Kincaid can no longer perform her past relevant work, but could perform those sedentary semi-skilled occupations such as office clerk and data clerk, which exist in her region in significant numbers (TR. 22-24). Therefore, the ALJ found Kincaid is not totally disabled, entitled to a period of disability or to the payment of disability insurance benefits (TR. 24).

Kincaid appeals the ALJ's findings on three grounds: (1) the ALJ misinterpreted the progress notes and improperly disregarded Dr. Blakely's July 13, 2005 opinions; (2) the ALJ's finding of Kincaid's residual functional capacity (RFC) is not supported by substantial evidence on the record; and (3) the ALJ failed to develop the record and should have ordered a consultive examination. **See** Filing No. 13. The court will address each issue below.

## STANDARD OF REVIEW

A district court is given jurisdiction to review a decision to deny disability benefits according to 42 U.S.C. § 405(g). A district court is to affirm the Commissioner's findings "if supported by substantial evidence on the record as a whole." ***Forte v. Barnhart***, 377 F.3d 892, 895 (8th Cir. 2004). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." ***Id***. "Whether the record supports a contrary result or whether we might decide the case differently is immaterial." ***Tellez v. Barnhart***, 403 F.3d 953, 956 (8th Cir. 2005). As long as substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently. ***Brown v. Barnhart***, 390 F.3d 535, 538 (8th Cir. 2004). "[I]t is the court's duty to review the disability benefit decision to determine if it is based on legal error." ***Nettles v. Schweiker***, 714 F.2d 833, 835-36 (8th Cir. 1983). Questions of law are reviewed de novo. **See *Olson v. Apfel***, 170 F.3d 822 (8th Cir. 1999). Findings of fact are considered conclusive if supported by substantial evidence on the record as a whole. **See *Nettles***, 714 F.2d 833.

"Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion." ***Pelkey v. Barnhart***, 433 F.3d 575, 577 (8th Cir. 2006) (citation omitted).  The reviewing court considers "the whole record, including evidence that supports as well as detracts from the Commissioner's decision, and [ ] will not reverse simply because some evidence may support the opposite conclusion." ***Id.*** at 578; ***Warburton v. Apfel***, 188 F.3d 1047, 1050 (8th Cir. 1999) (The court "may not reverse the Commissioner's decision merely because substantial evidence supports a contrary outcome.").  Furthermore, "[the court] defer[s] to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." ***Pelkey***, 433 F.3d at 578 (**quoting** ***Guilliams v. Barnhart***, 393 F.3d 798, 801 (8th Cir. 2005)); **see also** ***Burress v. Apfel***, 141 F.3d 875, 878 (8th Cir. 1998) (noting "substantial evidence in the record as a whole" standard is more rigorous than the "substantial evidence" standard)).

## DISCUSSION

**A.    The ALJ'S Consideration of Medical Evidence**

Kincaid argues the ALJ improperly disregarded Dr. Blakely's July 13, 2005 opinions. Kincaid argues the ALJ should not have discounted Dr. Blakely's opinions based on a misinterpretation of the progress notes without first contacting Dr. Blakely or ordering a consultative examination.  Kincaid requests the court to consider new evidence from Dr. Blakely in the form of an affidavit attached to Kincaid's opening brief.  **See** Filing No. 13, Appendix 1.  In Dr. Blakely's affidavit he explains how the progress notes can be interpreted consistent with the July 13, 2005 opinions.

"A treating physician's medical opinion is given controlling weight if that opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" ***Choate v. Barnhart***, 457 F.3d 865, 869 (8th Cir. 2006) (alteration in original) (**quoting** 20 C.F.R. § 404.1527(d)(2)).  "[The court] will uphold an ALJ's decision to discount or even disregard the opinion of a treating physician where 'other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders

12

inconsistent opinions that undermine the credibility of such opinions.'" **Id**. (**quoting Reed v. Barnhart**, 399 F.3d 917, 920-21 (8th Cir. 2005)). However, the regulations require "that the [ALJ] will always give good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s), *i.e.*, an opinion(s) on the nature and severity of an individual's impairment(s)." Policy Interpretation Ruling Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions, SSR 96-2p, 1996 WL 374188 at *5 (July 2, 1996); **see** 20 C.F.R. § 404.1527(d)(2).

The ALJ did not give significant weight to Dr. Blakely's July 13, 2005 opinions that Kincaid's muscular strength was severely impaired and that she did not have sufficient muscle to move effectively (TR. 21). The ALJ noted that such statements were "clearly inconsistent" with Dr. Blakely's own progress notes which indicated Kincaid had 5/5 muscle strength in her legs and arms, as well as, Dr. Blakely's notation that Kincaid's activities included walking a distance of one mile without an increase in symptoms (TR. 21). Additionally, the ALJ noted Kincaid's physical examinations did not indicate any atrophy or muscle wasting (TR. 21).

The plaintiff contends the ALJ misinterpreted Dr. Blakely's progress notes and should have either contacted Dr. Blakely to clarify the perceived inconsistency or ordered a consultative examination.

### 1. Duty to Contact

The plaintiff contends the ALJ had a duty to contact Dr. Blakely to clarify the perceived inconsistency because the ALJ has a "duty to develop the record fully and fairly, even in cases in which the claimant is represented by counsel." **Delrosa v. Sullivan**, 922 F.2d 480, 485 n.5 (8th Cir. 1991) (citations omitted). The plaintiff also cites **Forehand v. Barnhart**, 364 F.3d 984, 986-87 (8th Cir. 2004), for the proposition that a treating physician's opinions may not be rejected when the opinions are supported by the record evidence and consistent with the claimant's treatment history and allegations of limitation, although inconsistent with the opinion of a doctor who made a single examination. Kincaid argues Dr. Blakely's opinions are consistent with the medical record and medical text in this

case. Further, Kincaid offers an affidavit from Dr. Blakely explaining how his progress notes are consistent with his July 13, 2005 opinions.

The Commissioner contends the ALJ appropriately discounted Dr. Blakely's opinions and that such rejection did not trigger the duty to re-contact Dr. Blakely. The court agrees. "While the ALJ has an independent duty to develop the record in a social security disability hearing, the ALJ is not required to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." ***Goff v. Barnhart***, 421 F.3d 785, 791 (8th Cir. 2005) (internal quotations and citation omitted).

> The Commissioner's regulations explain that contacting a treating physician is necessary only if the doctor's records are "inadequate for us to determine whether [the claimant is] disabled" such as "when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques."

***Id.*** (**quoting** 20 C.F.R. §§ 404.1512(e), 416.912(e)).

In this case, the ALJ did not find Dr. Blakely's records inadequate, unclear, or incomplete, nor did he find the doctor used unacceptable clinical and laboratory techniques. Instead, the ALJ discounted the opinions because they were inconsistent with other substantial evidence, including Dr. Blakely's own records and objective findings, and Kincaid's reported medical history. In such cases, an ALJ may discount an opinion without seeking clarification.

### 2. Additional Evidence

Kincaid requests the court to consider new evidence in the form of an affidavit from Dr. Blakely, which explains his progress notes. **See** Filing No. 13, Appendix 1. Section 205(g) of the Act "generally precludes consideration on review of evidence outside the record before the Commissioner during the administrative proceedings." ***Jones v. Callahan***, 122 F.3d 1148, 1154 (8th Cir. 1997) (**citing** ***Delrosa***, 922 F.2d at 483). However, an exception provides that additional evidence may form the basis for remand under § 405(g) if the plaintiff establishes: "there is new evidence which is material and that

there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." **See** 42 U.S.C. § 405(g); ***Delrosa***, 922 F.2d at 483-84.  "To be considered material, the new evidence must be non-cumulative, relevant, and probative of the claimant's condition for the time period for which benefits were denied.  Furthermore, it must be reasonably likely that the Commissioner's consideration of this new evidence would have resulted in an award of benefits." ***Jones***, 122 F.3d at 1154 (internal citations omitted).

      The plaintiff failed to establish the elements of § 405(g) to allow consideration of additional evidence for remand.  Although the Commissioner raised the § 405(g) elements in the response brief (Filing No. 16), Kincaid failed to include an explanation in her reply brief (Filing No. 19).  Thus, the court does not have any information or explanation as to whether there was good cause for failure to submit Dr. Blakely's affidavit at the administrative level or the other requirements of § 405(g).  Further, Kincaid was on notice of the ALJ's perception of the progress notes during the hearing when the ALJ asked Kincaid about the apparent inconsistency (TR. 232).  Finally, viewing the evidence properly before the court in light most favorable to Kincaid, the court finds insufficient support for allowing consideration of additional evidence.  Accordingly, the court's review is confined to the evidence available to the ALJ and the new evidence from Dr. Blakely may not be considered to form a basis for remand.

### 3. Consultative Examination

> A consultative examination is a physical or mental examination or test purchased for [the claimant] at [the Commissioner's] request and expense from a treating source or another medical source. . . .  The decision to purchase a consultative examination will be made on an individual case basis in accordance with the provisions of §§ 404.1519a through 404.1519f.

20 C.F.R. § 404.1519.

      Consultative examinations may be proper when the evidence as a whole, both medical and nonmedical, is not sufficient to support a decision on the claim. **See** 20 C.F.R. § 404.1519a(b) (2006).  "'It is reversible error for an ALJ not to order a consultative

examination when such an evaluation is necessary for him to make an informed decision." *Haley v. Massanari*, 258 F.3d 742, 749 (8th Cir. 2001). "An ALJ is required to obtain additional medical evidence if the existing medical evidence is not a sufficient basis for a decision. But an ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." *Naber v. Shalala*, 22 F.3d 186, 189 (8th Cir. 1994) (**citing** 20 C.F.R. § 416.927(c)(3) and (4)).

Kincaid argues the ALJ should have ordered a consultative examination, the ALJ erroneously cited to medical evidence pre-dating the alleged onset of disability and the ALJ focused on terminology in the medical records such as "doing well" or "stable" which are irrelevant to the RFC standard. Kincaid contends the ALJ failed to appreciate the difference between what she can do compared to the demands of full-time competitive employment. Kincaid also argues the ALJ failed to support his findings with correctly interpreted medical evidence.

In this case, the medical records and other evidence presented to the ALJ were sufficient evidence to determine whether Kincaid was disabled. **See** *Warburton v. Apfel*, 188 F.3d 1047, 1051 (8th Cir. 1999) (holding no additional evidence necessary where the ALJ had the benefit of extensive testimony from the claimant during the lengthy hearing, as well as the benefit of treating physician's report). The record here contained evidence of Kincaid's regular and thorough examinations by two treating physicians, Kincaid's own testimony and other testimony and records. Kincaid fails to indicate what evidence was lacking in the record other than the ALJ's determination that Dr. Blakely's opinions and progress notes were inconsistent. Moreover, the medical evidence was sufficient for the ALJ to agree Kincaid suffered from a medically determinable impairment (polymyositis) which could reasonably be expected to produce the type of symptoms, e.g., musculoskeletal discomfort, that Kincaid described (TR. 20). Thus, sufficient medical evidence existed for the ALJ to determine whether Kincaid was disabled.

**B.     Residual Functional Capacity**

Kincaid argues the ALJ's finding that she has the residual functional capacity (RFC) for other work is not supported by the substantial evidence on the record.  **See** Filing No. 13.  Kincaid contends the ALJ erred by not finding credible all of her alleged limitations.  Kincaid argues the ALJ erred by finding Kincaid may miss only one day per month of work, rather than she would miss work at least three times per month.  Additionally, Kincaid contends the ALJ erred by failing to include a discussion about the "regular and continuous basis" test.

RFC is the most an individual can still do after considering the effects of all of her impairments on the ability to perform work related tasks, and is based on all of the relevant evidence in the case record.  **See** 20 C.F.R. § 404.1545(a); **Raney v. Barnhart**, 396 F.3d 1007, 1010 (8th Cir. 2005).  RFC is an assessment based on all appropriate evidence including:  observations by treating or examining physicians and family; medical records; and the claimant's own description of his limitations.  §§ 404.1545(a)-(c), 416.945(a)-(c).  The ALJ bears the primary responsibility for assessing a claimant's RFC at the administrative law judge hearing level.  **See** § 404.1546; **Roberts v. Apfel**, 222 F.3d 466, 469 (8th Cir. 2000).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Guilliams v. Barnhart**, 393 F.3d 798, 801 (8th Cir. 2005).  "The credibility of a claimant's subjective testimony is primarily for the ALJ to determine."  **Tellez v. Barnhart**, 403 F.3d 953, 957 (8th Cir. 2005).  A claimant's subjective complaints of pain may be discredited if inconsistencies exist in the record as a whole.  **See Guilliams**, 393 F.3d at 801-02.  In evaluating subjective complaints of pain, an ALJ is to examine objective medical evidence in addition to the factors set forth in **Polaski v. Heckler**, 739 F.2d 1320 (8th Cir. 1984). These factors include:  (1) the claimant's day to day activities; (2) the duration, intensity, and frequency of pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of pain medication; and (5) functional restrictions.  **Polaski**, 739 F.2d at 1322.

The ALJ applied the correct legal standard in evaluating Kincaid's credibility as to her symptoms and the effect, if any, those symptoms have on her ability to function (TR.

17). In determining a claimant's complaints of pain are not credible, the ALJ must give the reasons for discrediting the testimony and explain any inconsistencies found. ***Guilliams***, 393 F.3d at 802. The ALJ engaged in a thorough analysis of Kincaid's testimony and discredited her credibility pursuant to 20 C.F.R. § 404.1529 and ***Polaski***. Because the ALJ applied the correct legal standards, the court must take the ALJ's findings of fact as conclusive if supported by substantial evidence on the record as a whole. **See *Nettles***, 714 F.2d 833.

The ALJ found Kincaid's subjective complaints were inconsistent with the record as a whole (TR. 21). Specifically, the ALJ noted Kincaid's allegations were inconsistent with her own reports to Dr. Blakely and Dr. Smith, as well as the physicians' office notes and findings which showed Kincaid's condition was stable on medication and that she had good strength and use of her extremities (TR. 21). For instance, the ALJ noted that on June 2, 2004 (about 1-1/2 months subsequent to her alleged onset date of disability), Kincaid advised Dr. Blakely she was "doing good," swallowing "ok" and walking two miles, and Dr. Blakely's musculoskeletal examination was unremarkable (TR. 21). Dr. Smith's June 2, 2004, examination was also unremarkable and he opined Kincaid's polymyositis "has been stable" and was well-controlled (TR. 21). The ALJ further stated:

> On January 17, 2005, the Claimant advised Dr. Blakely that she was doing well, had "traveled to Florida & felt well" (in contrast to the Claimant's testimony at the hearing that she was "down" for 4 of the 9 days of the Florida trip), she was having only an occasional problem with fatigue or stress, she was leaving for a cruise and would not return until early February, and Dr. Blakely's musculoskeletal examination was unremarkable and he advised her that she should reduce her dosage of Prednisone after her cruise.

The ALJ additionally noted the record did not show Kincaid even mentioned many of the allegations she noted during the hearing to her treating physicians (for example, her allegations that she has symptoms every day, she does not leave home two to three days a week due to pain, she falls once a month due to stumbling from lack of strength, and that she does not have strength in her legs) (TR. 21).

The ALJ also determined significant weight should not be given to Dr. Blakely's July 13, 2005 opinions. The ALJ noted inconsistencies with regard to Dr. Blakely's progress

notes, which indicated Kincaid engaging in physical activity without an increase in symptoms and no indication of atrophy or muscle wasting (TR. 21). "Physician opinions that are internally inconsistent, however, are entitled to less deference than they would receive in the absence of inconsistencies." **Guilliams**, 393 F.3d at 803.

In this case, ALJ properly evaluated Kincaid's RFC based on evidence in the record including medical examinations and testimony. The record as a whole supports the ALJ's decision to discredit Kincaid's testimony as to her symptoms, other testimony and some of Dr. Blakely's July 13, 2005 opinions. The ALJ properly included only those limitations he found credible, and sustainable performance shown in the record, when questioning the VE and interpreting the VE's testimony. **See Roberts v. Apfel**, 222 F.3d 466, 471 (8th Cir. 2000). Substantial evidence in records supports the ALJ's determination of Kincaid's limitations and other findings. Accordingly, the Commissioner's decision is affirmed. Upon consideration,

**IT IS ORDERED**:

The decision of the Commissioner is affirmed, the appeal is denied, and judgment in favor of the defendant will be entered in a separate document.

DATED this 29th day of January, 2007.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge